NO. CIV-12-755-L

---

## IN THE UNITED STATES DISTRICT COURT FOR
## THE WESTERN DISTRICT OF OKLAHOMA

---

**AVIS HUNT, as Special Administrator for the
ESTATE OF DAMON LAMONT FALLS, deceased,**

**Plaintiff,**
**v.**

**DANIEL HERRING,** *et al.,*

**Defendants.**

---

## DEFENDANT CITY'S
## MOTION FOR SUMMARY JUDGMENT
## AND
## BRIEF IN SUPPORT

---

**KENNETH JORDAN**
**Municipal Counselor**

By: **Richard C. Smith, OBA #8397**
**Jennifer Warren, OBA #30284**
**Assistant Municipal Counselors**
**200 N. Walker, Suite 400**
**Oklahoma City, OK 73102**
**(405) 297-2451   FAX (405) 297-3851**
**Attorneys for Defendant**
**City of Oklahoma City**
rick.smith@okc.gov
jennifer.warren@okc.gov

# TABLE OF CONTENTS

Table of Authorities .................................................................................................. ii

Brief in Support ........................................................................................................ 1

Statement of Material Facts Not In Dispute ........................................................... 1

Facts Surrounding Plaintiff's Decedent's Arrest .................................................. 10

Statement of the Case ............................................................................................ 16

Standard on Summary Judgment ........................................................................... 17

Argument and Authorities ..................................................................................... 18

    Proposition I:  The Defendant Officers Committed
    No Constitutional Violation ............................................................................ 18

    Proposition II:  Defendant City's Policies,
    Procedures, and Customs are Constitutional .................................................. 22

    Proposition III:  Defendant City's Training
    of its Police Officers is Constitutional .......................................................... 24

    Proposition IV:  Defendant City is Entitled to Summary
    Judgment on Plaintiff's Failure to Hire and Supervise Claim ...................... 28

Conclusion ............................................................................................................. 30

Certificate of Service ............................................................................................. 31

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.,*
 477 U.S. 242 (1986) ................................................................................ 17

*Barney v. Pulsipher,*
 143 F.3d 1299 (10th Cir. 1998) ............................................................. 22, 26

*Board of Comm'rs of Bryan Cty. v. Brown,*
 520 U.S. 397 (1997) ........................................................................ 26, 28, 29

*Bryson v. City of Oklahoma City,*
 627 F.3d 784 (10th Cir. 2010), *cert denied* _____ U.S._____,
 131 S.Ct. 3030 (2011)........................................................................... 7, 29

*Canton v. Harris,*
 489 U.S. 378 (1989) ........................................................................ 24, 25, 29

*Carr v. Castle,*
 337 F.3d 1221 (10th Cir. 2003) ......................................................... 7, 25, 26

*Casey v. City of Federal Heights,*
 509 F.3d 1278 (10th Cir. 2007) ............................................................. 20, 21

*Cavanaugh v. Woods Cross City,*
 625 F.3d 661 (10th Cir. 2010) ............................................................... 20, 21

*Celotex Corp. v. Catrett,*
 477 U.S. 317 (1986) ................................................................................ 18

*City of Los Angeles v. Heller,*
 475 U.S. 796 (1986) ................................................................................ 18

*City of Oklahoma City v. Tuttle,*
 471 U.S. 808 (1985) ................................................................................ 22

*City of St. Louis v. Praprotnik,*
 485 U.S. 112 (1988) .......................................................................... 7, 23, 24

*Connick v. Thompson,*
 __ U.S. __, 131 S. Ct. 1350 (2011) ..................................................... 24, 26

*Franklin v. Thompson,*
    918 F.3d 1168 (10th Cir. 1992) ................................................................................. 7

*Graham v. Connor,*
    490 U.S. 386 (1989) ................................................................................................ 19

*Hinton v. City of Elwood, Kansas,*
    997 F.2d 744 (10th Cir. 1993) ........................................................................... 20, 21

*Hoyt v. Cooks,*
    672 F.3d  972 (11th Cir. 2012) ............................................................................. 12

*Illinois v. Wardlow,*
    528 U.S. 119 (2000) ............................................................................................ 18, 19

*Lounds v. Torres,*
    217 Fed. Appx.755 (10th Cir. 2007) ...................................................................... 7

*Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,*
    475 U.S. 574 (1986).............................................................................................. 17

*Monell v. Dep't. of Social Services,*
    436 U.S. 658 (1978) .............................................................................................. 22

*Novitsky v. City of Aurora,*
    491 F.3d 1244 (10th Cir. 2007) ........................................................................... 20

*Pennsylvania v. Mimms*,
    434 U.S. 106 (1977) .............................................................................................. 20

*Schneider v. City of Grand Junction Police Department*,
    717 F.3d 760 (10th Cir. 2013) ............................................................................. 22

*Scott v. Harris*,
    550 U.S. 372 (2007) .............................................................................................. 17

*Tennessee v. Garner*,
    471 U.S. 1 (1985) .................................................................................................... 8

*Terry v. Ohio*,
    392 U.S. 1 (1968) .................................................................................................. 18

*U.S. v. Hensley*,
469 U.S. 221 (1985) ................................................................... 20

*Wilson v. Meeks,*
52 F.3d 1547 (10th Cir. 1995) ................................................ 28

Wilson *v*. Meeks,
98 F.3d 1247 (10th Cir. 1996). ............................................. 28

**Federal Statute**

42 U.S.C. § 1983 .......................................................... 22, 24, 26, 29

**State Statutes**

21 O.S. §1283 ................................................................... 11, 19

21 O.S. § 1290.8(C) ......................................................... 11, 19

21 O.S. § 1301 ................................................................. 10, 19

21 O.S. § 1303 ................................................................. 10, 19

70 O.S. § 3311 ....................................................................... 2

2007 Okla. Sess.Laws ch. 360 § 6 ............................................. 2

**Rule**

Rule 56 of the Federal Rules of Civil Procedure ........................... 1, 17

# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

AVIS HUNT, as Special Administrator )
for the ESTATE OF DAMON LAMONT )
FALLS, deceased, )
            )
     Plaintiff, )
            )
v. )      Case No. CIV-12-755-L
            )
DANIEL HERRING, *et al.,* )
            )
     Defendants. )

## DEFENDANT CITY'S MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT

COMES NOW a Defendant, the City of Oklahoma City, and pursuant to Rule 56 of the Federal Rules of Civil Procedure, hereby moves this Court to grant it Judgment against Plaintiff as there is no dispute of material fact and Defendant City is entitled to a Judgment as a matter of law. In support of its Motion, Defendant City offers the attached Brief.

## BRIEF IN SUPPORT

## STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

1. Officer Ramon Castro was employed as a police recruit by Defendant City on May 29, 2009, and received police training at the OCPD Training Academy from then until December 10, 2009, for a total of 1,088 hours. (Affidavit of OCPD Chief William Citty, Exhibit 1; Syllabus of OCPD Recruit Class #127, Exhibit 2; OCPD Policies 670.0, Training and 670.10, Recruit Training, Exhibit 3; OCPD Procedures 431.0**,** Recruit Academy and 431.10, Major Grades, Exhibit 4).

2. Officer Aaron Wake was employed as police recruits by Defendant City on November 4, 2005, and received police training at the OCPD Training Academy from then until May 4, 2006, for a total of 984 hours. (Exhibit 1; Syllabus of OCPD Recruit Class #122, Exhibit 5; Exhibits 3 and 4.)

3. Officer Jacob Cole was employed as a police recruit by Defendant City on June 2, 2006, and received police training at the OCPD Training Academy from then until November 30, 2006 for a total of 968 hours. (Exhibit 1; Syllabus of OCPD Recruit Class #123, Exhibit 6; Exhibits 3 and 4.)

4. The Council on Law Enforcement, Education, and Training (CLEET) must issue or approve all police training outlines. All OCPD outlines are CLEET issued or approved. (Exhibit 1.) To be certified by the State of Oklahoma, state statute required that a police recruit receive a total of 300 hours of police training for 2006 graduates and 576 hours of training for 2009 graduates.[1] Historical comments on 70 O.S. § 3311 in West's Oklahoma Statutes Annotated.

5. During their training academy, the defendant Officers received training on the following subjects that are relevant in this case: Probable Cause, Laws of Arrest, Legal Issues Involving Use of Force, Civil Liability/Civil Process, Custody Control/Defensive Tactics, and Searching and Transporting Prisoners. (Exhibits 2, 5 and 6; Training Outlines, Exhibits 7-16, and 74-75, respectively; Exhibit 1.)

---

[1] The 2007 Legislature raised the basic training hours (subject to availability of funds) to 375 hours for 2007 graduates; January 1 - June 30, 2008 graduates to 505 hours; July 1, 2008 - June 30, 2009 graduates to 576 hours and thereafter, 600 hours. 2007 Okla. Sess.Laws ch. 360 § 6.

6. Following their graduation from the Training Academy, these Defendants (like all OCPD recruits) received approximately four (4) months of additional training with a Field Training Officer. (Policy 670.20, Field Training and Evaluation Program, Exhibit 17; Procedure 434.0, Field Training Evaluation Unit, and 434.10, Field Training Evaluation Program, Exhibit 18; Exhibit 1).

7. Officer Cole attended 98 hours of In-Service training between July 24, 2007 and July 5, 2010. (In-Service Training record of Officer Cole, Exhibit 19; Policy 670.30, In-Service Training, Exhibit 20; Procedure 436.0, In-Service Training and Procedure 436.05, Attendance, Exhibit 21; Exhibit 1).

8. On May 4-5, 2010, as part of his In-Service Training, Officer Cole received 10 hours of training regarding the use of a Taser. (Exhibit 19; Taser Training Manual 2010, Exhibit 22; and Exhibit 1.) The training material was provided by Taser International and is dated November, 2009. Taser International did not consider the use of a taser to be a deadly force and the material did not restrict the use of the taser to deadly force situations. (Exhibit 22, page 37 of Manual.) Taser International's training material does not specifically limit the number of activations or their duration.[2] (*Id*.) It does train officers to:

---

[2] The April 2010 International Association of Chiefs of Police Model Policy on Electronic Control Weapons stated that "Upon activating the device against a person, the officer shall energize the subject no longer than objectively reasonable to overcome resistance and bring the subject under control." (Model Policy, § IV(C)(8), attached as Exhibit 77.) The policy required officers to request EMT assistance if an individual was exposed to more than three (3) taser cycles or a continuous cycle of fifteen (15) seconds or more. However, like Taser International, the policy did not limit the number of taser activations or the duration of the taser activations. *Id.* at § IV(D)(2).

**Minimize Repeated, Continuous, or Simultaneous Exposures.** Reasonable efforts should be made to minimize the number of ECD exposures. ECD Users should use the lowest number of ECD exposures that are objectively reasonable to accomplish lawful objectives and should reassess the subject's resistance level before initiating or continuing the exposure.

"Simultaneous" means delivery to the body of electrical charge by multiple ECDs or multiple completed circuits at the same time.

Taser International's warning and instructions, pg. 5. (Exhibit 22.) The Training Manual

also instructs users to:

**Avoid Extended or Repeated TASER Device Applications Where Practicable**
· The application of the TASER device is a physically stressful event.
· Especially when dealing with persons in a health crisis such as excited delirium, it is advisable to minimize the physical and psychological stress to the subject to the greatest degree possible.
· Officers should only apply the number of cycles reasonably necessary to allow them to safely restrain the subject.
· Current human studies have concluded that TASER applications directly across the chest do not impair normal breathing patterns.
· If circumstances require extended duration or repeated discharges, the operator should take care to observe the subject and provide breaks in the TASER simulation when practicable.

Training Manual, pg. 48. (Exhibit 22). Officer Cole did discharge his taser during this

incident. See Facts Surrounding Plaintiff's Decedent's Arrest Nos. 11 and 12.

9. Officer Zachary Miller, who was present during the arrest, also received taser

training in 2010. (In-Service Record of Officer Miller, Exhibit 23). However, Officer

Miller did not deploy his taser on July 5, 2010. (Taser Deployment Record of Officer

Miller, Exhibit 24, Deposition of Miller, page 9.9-9.12.)

10. Officer Castro attended 11 hours of In-Service training between January 1, 2010

and July 5, 2010. (In-Service Training record of Officer Castro, Exhibit 25; Exhibits 20-

21; and Exhibit 1.)  Officer Castro was not carrying a taser on July 5, 2010 and did not deploy one.  (Deposition of Castro, p. 34.16-34.18.)

11. Officer Wake attended 95 hours of In-Service training between September 18, 2006 and July 5, 2010.  (In-Service Training record of Officer Wake, Exhibit 26; Exhibits 20-21; and Exhibit 1.) Officer Wake was not carrying a taser on July 5, 2010 and did not deploy one.  (Deposition of Wake, p. 28.21-28.23.)

12. Upon their induction into the OCPD, officers are issued copies of the OCPD Operations Manual, which contains current OCPD Policies, Procedures and Rules. The officers are directed to be familiar with the contents of the Operations Manual and to keep the Manual updated with any new policies, procedures, and rules as they are issued. (Policy 030.0, Policy Review, Exhibit 27; Procedures 113.0, Issuance of Policies, Procedures and Rules, 113.10 Responsibility, 113.20 Distribution of Operations Manual, and 113.30 Update of Operations Manual, Exhibit 28; Rule 100.0, Compliance with Policies, Exhibit 29; Rule 105.0, Condition of Manual, Exhibit 30; and Exhibit 1.)

13. In 2000, the OCPD issued the Fourth Edition of its Operations Manual.  As of July 5, 2010, each of the defendant officers had received a copy of the Fourth Edition of the Manual. (Defendants' receipts for the Fourth Edition of the OCPD Operations Manual, Exhibits 31-34; and Exhibit 1.)

14.  As of July 5, 2010, Defendant City had adopted the following police department Policies relevant to Plaintiff's claims:    105.0 Mission Statement; 110.0 Primary Objective; 120.10 Apprehension of Offenders; 205.0, 205.10, 205.15 Standard of Conduct; 220.0 Respect for Constitutional Rights; 285.0, 285.10 Allegations of

Employee Misconduct; 287.0 Discipline; 320.0 Individual Dignity; 330.0 Role of the Individual Officer; 505.0 Nature of the Task; 510.0 Police Action Based on Legal Justification; 512.0 Alternatives to Physical Arrest or Detention; 528.0 Field Supervision: 554.0, 554.10, 554.20, 554.30, 554.40 Use of Force; 665.0 Personnel; and 670.0 Training. (A copy of these Policies are attached as Exhibits 3,35-49; Exhibit 1.)

15. As of July 5, 2010, the OCPD had adopted the following Procedures relevant to Plaintiff's claims: 150.0 Use of Force Reporting Procedures (See Facts 18 and 19 herein); 152.0 Less Lethal Devices; 148.0 Early Intervention Program; 143.0 Complaints Against Police Department Employees; 160.0, 160.20, 160.40 Departmental Boards and Committees; 170.0 Disciplinary Action; 233.0 Medical Treatment for Persons In Custody; 230.0 Arrest Procedure; and 424.0 Recruiting. (A copy of these Procedures are attached as Exhibits 50-58; Exhibit 1.)

16. As of July 5, 2010, the OCPD had adopted the following Rules relevant to Plaintiff's claims: 120.0 Truthfulness/Cooperation; 205.0 Disciplinary Actions; 348.0 Use of Force; and 470.0 Constitutional Rights. (A copy of these Rules are attached as Exhibits 59-62, Exhibit 1.)

17. Defendant City's policy on Use of Force, and its training of its police officers on the use of deadly and non-deadly force, have been repeatedly upheld by Judges in this District. These cases include, but are not limited to, *Rios v. City of Oklahoma City, et al.*, CIV-87-2383-T; *Franklin v. Thompson, et al.*, CIV-89-1492-T; *Carr v. City of Oklahoma City, et al.,* CIV-01-124-C; *Grigsby v. City of Oklahoma City*, CIV-02-1220-F; *Fuston-Lounds v. City of Oklahoma City, et al.*, CIV-03-1519-T; *Baker v. City of Oklahoma City,*

*et al*., CIV-06-322-L; and, *Pickering v. City of Oklahoma City, et al.,* CIV-06-466-M. [3] (Copies of these Orders are Attachments A-G, respectively.)  In *Franklin*, the plaintiff only appealed the jury verdict in favor of the officer and did not challenge the ruling upholding Defendant City's policies and procedures.  This jury verdict was upheld. *Franklin v. Thompson*, 981 F.2d 1168 (10th Cir. 1992).  In *Carr v. City,* Judge Cauthron upheld the City's written policies and training of officers on the use of deadly force.  The plaintiff appealed this Order, and the Tenth Circuit affirmed this grant in *Carr v. Castle*, 337 F.3d 1221 (10th Cir. 2003).  In *Fuston-Lounds v. Torres, et al.,* the plaintiff alleged a failure to train in another deadly force case.  The District Court granted the City Judgment.  Ms. Lounds appealed this Order and the Circuit Court affirmed it at *Lounds v. Torres,* 217 Fed. Appx.755 (10th Cir. 2007).

In *Coffee v. City of Oklahoma City, et al.,* CIV-08-239-W (Order, Attachment H), Judge West granted Defendant City's Motion for Summary Judgment on plaintiff's claim of ratification of the defendant officer's use of alleged excessive force. That plaintiff argued that because the OCPD, after the fact, investigated the officer's use of force and did not discipline him, it ratified the use of force.  Judge West noted that the City's after-the-fact investigation could not be the direct causal link of the officer's use of force.  (Pp. 10-11.)  Additionally, the OCPD did not believe plaintiff's "version" of the event, and therefore, the City could not have approved the "basis" for the event.  *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988), and *Bryson v. City of Oklahoma City,* 627 F.3d 784,788 (10th Cir. 2010), *cert denied* _____ U.S._____, 131 S.Ct. 3030 (2011).

---

[3] Only *Pickering* involved the use of a taser.

18. In March 2007, the OCPD was accredited by the Commission on Accreditation for Law Enforcement Agencies, Inc. (CALEA).[4] This agency reviewed the various activities of the OCPD and found that the OCPD had a "very comprehensive Code of Conduct" (p. 26 Chapter 26 of CALEA's January 15, 2007 Assessment Report, Exhibit 63); an "emphasis on quality training" which was "very evident" (p. 27 Chapter 33, Exhibit 63); and had a "very complete and thorough reporting system with regard to the discharge of firearms….Equally detailed types of reporting are completed for incidents involving less than lethal use of force." (p.14, Section L, Exhibit 63). It refers to OCPD training on less than lethal use of force. (*Id*.) On March 27, 2010, CALEA again awarded the OCPD Accreditation. (Letters of Accreditation, Exhibit 64.) (Exhibit 1.)

19. The OCPD has procedures requiring an investigation on any use of force beyond routine handcuffing. Initially, the supervising Lieutenant on duty performs the investigation. It is then reviewed by his Major to determine if the use of force was justified and appropriate under OCPD Polices. The use of force report is then reviewed by three other Majors. Because this incident resulted in the death of a person in custody, it was investigated initially by the Homicide Division of the OCPD. (OCPD Procedures 150.0-150.14 and 150.18-150.31, Exhibit 50; Exhibit 1.) This investigation was submitted to the District Attorney for his determination regarding whether the officers'

---

[4] In *Tennessee v. Garner,* 471 U.S. 1, 18 (1985), the United States Supreme Court stated: "For accreditation by the Commission on Accreditation for Law Enforcement Agencies, a department must restrict the use of deadly force to situations where "the officer reasonably believes that the action is in defense of human life … or in defense of any person in immediate danger of serious physical injury." Commission on Accreditation for Law Enforcement Agencies, Inc., Standards for law Enforcement Agencies 1-2 (1983) (italics deleted)."

actions violated state law. After his decision, it was investigated by the Office of Professional Standards to determine if the officers' conduct violated OCPD Policy and/or Procedures. The results of that investigation were reviewed by the Screening Committee and ultimately one of the Deputy Chiefs of the Operations Bureau. (Exhibit 1.)

20. The following procedures relevant to a use of force investigation (and to this incident) were in effect on July 3, 2010 (Exhibit 50): 150.0, Use of Force Report; 150.01, Notification, 150.02; Post Use of Force Incident Employee Procedures;[5] 150.10, Responsibilities; 150.11, Responsibilities of the Involved Officer/Employee; 150.12, Responsibility of the Witnessing Officer/Employee; 150.13, and Responsibilities of the Supervisor; 150.14. Because Mr. Falls died, the following procedures were followed: 150.18 Use of Deadly Force, In-Custody Death, and/or Use of Force Resulting in Injuries Requiring Hospitalization; 150.20 Other Incidents of Injury or Death Involving the Use of Force **Excluding a Firearm**; 150.21 Responsibilities of the Involved /Witnessing Officer/Employee; 150.22 Responsibilities of the Communications Unit Supervisor; 150.23 Responsibilities of the Field Supervisor; 150.24 Responsibility of the Watch Commander; 150.25 Responsibility of the Office of Professional Standards; 150.26 Responsibilities of the Investigations Supervisor(s); 150.28 Responsibility of the Investigations/Operations Bureau Chief; 150.29 Responsibility of Division Commander; 150.30 Responsibility of the Screening Committee; 150.31 Chief of Police; and OCPD

---

[5] Please note that ¶ A requires the officer to "Render first aid and/or summon medical attention."

Procedure 160.40, Screening Committee (Exhibit 54; Exhibit 1.)

21. The Plaintiff does not have any knowledge regarding the training or policies of the OCPD. (Plaintiff's Response and Supplemental Response to Defendant City's Interrogatories especially Interrogatory No. 3, Exhibit 65.)

### FACTS SURROUNDING PLAINTIFF'S DECEDENT'S ARREST

1. On July 5, 2010, at approximately 7:30 p.m., Plaintiff's decedent, Damon Lamont Falls, entered the Dollar General Store at 910 S.E. 44th Street in Oklahoma City wearing a sweatshirt, baseball cap, sunglasses, a wig, and a fake beard. (Photograph taken from video and video from Dollar General, Exhibits 66-67. 911 call from David Timmons, Exhibit 68.) It is a violation of State law to appear in public while wearing "a mask, hood or covering." 21 O.S. § 1301. It is a felony to assault a person with a dangerous weapon "while masked or in disguise." 21 O.S. § 1303.

2. An employee at the Dollar General store observed Falls and was concerned by his behavior and appearance. She paged the store manager, David Timmons, who contacted 911 to report Mr. Falls' behavior. Mr. Timmons believed that Mr. Falls was going to rob the store or try to harm the people in the store. (Deposition of Timmons, pg. 11.17-12.6, 12.17-13.1; 13.24-14.7; Exhibit 68.)

3. OCPD officers were dispatched to the store. Officers Wake and Castro arrived at approximately the same time. They made contact with Mr. Timmons and Ms. Moore, who indicated where Mr. Falls was located in the store. (Deposition of Wake, 38.21-40.4, 41.13-41.18; Deposition of Castro, 64.8-64.9, 69.10-71.20, 72.20-72.23.)

4. The officers made contact with Falls, who was standing in one of the store aisles

and who fit the description that had been provided to 911. Officer Castro said something to the effect of "what's going on" and Falls said "I ain't doing nothing." Officer Wake attempted to grab Mr. Falls' wrist. Mr. Falls jerked away and ran out of the store heading west down S.E. 44th street. Officers Wake and Castro followed Falls. (Deposition of Wake, 44.16-44.23, 51.21-52.7, 60.17-60.22, 64.12-64.23; Deposition of Castro, 77.14-78.1, 79.25-80.2, 102.2-102.5; Deposition of Timmons, 12.6-12.16).

5.    After exiting the store, a gun fell from Falls as he was running. Officer Wake picked up the gun and continued the pursuit.[6] Officer Wake also advised other officers over the radio that the suspect was running and had a gun. (Deposition of Wake, 64.12-65.8, Deposition of Castro, 112.24-113.2, Dispatch Tape, Exhibit 69.) Officer's Cole and Miller heard Officer Wake's radio dispatch. (Deposition of Cole, 83.6-83.17; Deposition of Miller, 94.13-94.17).

6.    During the footchase, Officer Castro instructed Falls to stop running and get on the ground. Near S.E. 44th Street and Phillips Ave, Falls began to slow. Officer Castro drew his weapon and ordered him to get on the ground and put his hands behind his back. Falls fell to the ground, on his own, and Officer Castro sat on Falls' back. Falls had his hands underneath his body near his waistband. (Deposition of Castro, 117.13-117.21, 119.11-119.22, 120.1-120.7, 121.2-121.11).

7.    Officer Wake then arrived and Officer Castro holstered his weapon. Officer Castro

---

[6]The officers were unaware that Plaintiff's decedent was a convicted felon (for armed robbery) and pursuant to 21 O.S. §1283 was committing a felony by possessing a firearm. While Oklahoma had enacted a "concealed carry" statute, it is a crime to not announce to law enforcement that a permittee is carrying a concealed weapon. 21 O.S. § 1290.8(C).

attempted to pull Falls' right arm out from underneath his body while Officer Wake tried to control Falls' left side. The officers were constantly ordering Falls to stop resisting and to give them his arms. (Deposition of Wake, 74.1-74.19; Deposition of Castro, 130.14-130.18).

8. Officers Cole and Miller arrived on the scene at approximately the same time. They observed Officer Wake and Officer Castro struggling to gain control of Falls, who continued to resist, disobey the officers' instructions, and was moving his hand near his waist area. Officer Miller attempted to help control Falls' movements by grabbing his right forearm and placing his leg across Falls' right shoulder. (Deposition of Miller, 30.17-31.6, 33.5-33.15; Deposition of Cole, 85.21-85.22, 86.9-87.10, 103.10-104.8.)

9. Officer Miller observed that "We're telling him to stop resisting, put his hands behind his back and he's refusing to comply. He is actively, physically resisting four officers who cannot get him under control." (Deposition of Miller, 29.12-29.15)

10. After observing that the three officers were struggling to control Falls, Officer Cole performed a full deployment of his taser into Falls' back in an attempt to get Falls to stop resisting so that he could be handcuffed.[7] The taser had no effect because one of the wires broke off from one of the probes. Falls continued to struggle. (Deposition of Cole, 89.13-89.23, 90.17-90.24, 98.25-100.3, 103.2-103.5, 108.7-108.12; Deposition of Miller, 45.13-45.16).

---

[7] OCPD police department policies also refer to a "taser" as an "ERD" (electronic restraint device). There are several ways this device can be utilized. It can project probes attached to electrical wires or be used by touching the subject with the device with or without the cartridge, that had contained the probes, which is called a "touch tase" or "drive stun." *See also Hoyt v. Cooks,* 672 F.3d 972, 976, n. 4 (11th Cir. 2012).

11. Officer Cole then performed 2-3 "cartridge on touch stun" or "drive stun" deployments of the taser into Falls' back, through his clothing. The initial deployment and 2-3 cartridge on drive stuns occurred during the initial 12 second deployment recorded on the deployment download record. The drive stuns had no effect (again because one of the wires was broken off) and Falls continued to struggle. (Deposition of Cole, 99.16-101.20, 102.8-102.11, 102.25-103.5, 108.7-108.12.)

12. Officer Cole then performed another cartridge on drive stun. Again, this did not have any effect on Falls' behavior. (Deposition of Cole, 105.10-105.12, 112.3-112.10, 115.20-116.2). Officer Cole then removed the cartridge from the taser. Falls continued to struggle and resist. Officer Miller then lifted Falls' shirt and Officer Cole performed another touch stun on Falls' back. Falls reached behind him and attempted to push the taser away from his back. Officers were then able to grab one of his arms. [8] (Deposition of Cole, 113.13-113.23, 115.23-117.11, Deposition of Miller, 62.19-62.24, 63.11-63.23, 65.16-65.23, 68.10-68.13.)

13. During the encounter with Falls, Officer Cole's taser was deployed a total of five (5) times. [9]

---

[8] During this incident the Taser was activated for a total of 32 seconds. (Taser Download, Exhibit 70). Officer Cole guessed that due to Falls movement, his pushing the Taser away, and Cole pulling the taser away, the taser was only in contact with Falls for half that time. (Deposition of Cole, 125.25-126.11.)

[9] All tasers carried by OCPD officers record the date and length of any taser deployment. A download of Officer Cole's taser deployment record indicates that on July 5, 2010, Officer Cole's taser was deployed once at approximately 3:24 p.m. for one second. This is consistent with the recommendation that officers test their taser at the beginning of their shift. (See Exhibit 22, Taser Training Outline at p. 6).The download also indicates that on July 5, 2010, starting at approximately 7:42 p.m., Officer Cole's taser was

14. OCPD Officers Herring and Duncan arrived on the scene and observed that Falls was still resisting. Officer Herring held down Falls' right leg and Officer Duncan held down his left leg. (Deposition of Herring, Deposition of Duncan, 21.18-22.13, 24.19-24.23.)

15. Eventually the officers were able to place Falls in handcuffs (initially, Falls was secured with two separate sets of handcuffs that were joined in the middle). (Deposition of Miller, 65.16-65.18, 70.16-70.22; Deposition of Cole, 118.12-118.17). At 7:40 p.m., the officers advised dispatch that he was in custody and at 7:42 p.m. requested that an EMSA unit respond to the scene. (CAD Report, Exhibit 71).

16. After handcuffs were secured on Falls he was searched and a "stun gun" was found in his right front pants pocket. During the search, Falls spit on Officer Miller so, for officer safety, a spit guard was placed over his head. Falls continued to move around on the ground so a single set of hinge handcuffs was applied. (Deposition of Miller, 76.17-77-24, 79.4-80.0, Deposition of Herring, 46.1-46.14).

17. Falls complained that he was having difficulty breathing. He continued to roll around on the ground and yell. He was rolled onto his left side and instructed to stay there to help his breathing and so the probes from the taser would not go further into his back. (Deposition of Miller, 81.23-83.20; Deposition of Herring, 44.3-44.9).

---

deployed five additional times (for twelve (12) seconds ending at 7:42:09; for five (5) seconds ending at 7:42:19; for five (5) seconds ending at 7:42:40; for five (5) seconds ending at 7:42:47; and for five (5) seconds ending at 7:43:04.) (Taser Download of Officer Cole, Exhibit 70) (Exhibit 1).

18.   Pursuant to OCPD Procedure 150.00 *et seq*. (Exhibit 50), because the officers' used force to make arrest, an on-duty Lieutenant was called to the scene. Lt. Strecker arrived, interviewed the officers and attempted to interview Falls. He took the initial photographs of Falls and the scene.  (Photographs Exhibit 72.)

19.   Falls was not tased after any handcuff was applied.  (Deposition of Cole, 150.21-150.5.)

20.   EMSA paramedics arrived on the scene and examined Falls visually. At this time, Falls was yelling and still trying to move around. (Deposition of Cole, 130.8-132.3; Deposition of Miller, 84.24-85.3). The EMSA records state that as the paramedics approached Falls "he was kicking his legs" and when asked what was going on, Falls said "Fuck you." The records also note that the paramedic continued to check on Falls and that he was moving around. (EMSA records, pg. 1, Exhibit 76). The paramedics remained on the scene and provided treatment to Officer Wake for shortness of breath. (Deposition of Wake, 109:10-110:7.)

21.   Officers Cole and Castro then instructed Falls to stand up. They helped him to his feet in order to place him in the back of a scout car. At this point, the officers noticed that Falls was unresponsive and called one of the EMSA paramedics over for assistance. Officers began taking turns performing chest compressions while the EMSA paramedics began pulmonary resuscitation. Eventually, Mr. Falls was loaded into the ambulance and transported to Southwest Medical Center where he was pronounced dead. (Deposition of Cole, 132-10-132.15; Deposition of Miller, 87.8-88.9)

22. The Oklahoma Medical Examiner's Report lists the probable cause of death as

"Cardiac Arrhythmia" due to "Stress" and "Attempt to Escape/Resist Police Custody." The Report lists other significant medical conditions as "Cardiomegaly" and "Methamphetamine Use." The Toxicology Report found that Mr. Fall's blood sample was positive for Methamphetamine and Amphetamine. (Medical Examiner's Report, Exhibit 73.)

## STATEMENT OF THE CASE

On July 3, 2012, Plaintiff filed her Complaint alleging that the defendant officers used excessive force when they arrested her decedent, Damon Lamont Falls, and that Defendant City failed to adequately train, hire, and supervise the defendant officers and maintained a de facto policy of permitting excessive force. The Complaint does not claim that the arrest of Plaintiff was without probable cause. Plaintiff's Complaint alleges claims for violations of the Fourth Amendment, Eighth Amendment, and Fourteenth Amendment of the U.S. Constitution.[10] On August 8, 2012, this Court granted Defendant City's Motion to Dismiss the City from Plaintiff's Eighth and Fourteenth Amendment claims. (Doc. 15). Thus, Plaintiff's only remaining claim against the City is that it violated Falls' Fourth Amendment rights by failing to adequately train, hire and supervise its defendant officers and by maintaining a policy or custom of permitting excessive force.

---

[10] Although Plaintiff claims in paragraph 1 of her Complaint that she is bringing this action "for violation of Plaintiff's Constitutional rights, Oklahoma State law, and common law," the causes of action she pleads only arise under federal law. As Defendant City noted in paragraph 1(C) of its Answer, Plaintiff has not plead a claim under Oklahoma state law or common law. Further, the Plaintiff has not amended her Complaint to include such a claim.

On July 11, 2013, Plaintiff requested that the Court dismiss Officers Herring and Duncan apparently because they arrived after the tasing. (Doc. 31.) On August 5, 2013, this Court dismissed these Defendants. (Doc. 32.) On August 23, 2013, Plaintiff also requested that Officer Miller also be dismissed from this case. (Doc. 33). The Court dismissed Officer Miller on September 25, 2013. (Doc. 34).

## STANDARD ON SUMMARY JUDGMENT

To succeed on a Motion for Summary Judgment, the moving party must establish that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. However, when the moving party has carried its burden under Rule 56, the nonmoving party must do "more than simply show that there is some metaphysical doubt as to the material facts" and must "come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). Thus, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issues of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248 (1986). "Material" facts are those "that may affect the outcome of the suit involving the governing law." *Id.* at 248. Furthermore, when an opposing party tells a story that is "blatantly contradicted by the record, so that no jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a Motion for Summary Judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Lastly, summary judgment is appropriate where the moving party shows that the

opposing party is unable to produce sufficient evidence in support of the opposing party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The moving party's summary judgment does not need to be supported by affidavits or other material specifically negating the non-moving party's claim, so long as the court is satisfied that there is an absence of sufficient evidence to support such a claim. *Id.*

## ARGUMENT AND AUTHORITIES

### Proposition I: The Defendant Officers Committed No Constitutional Violation.

Plaintiff alleges that the defendant officers violated the Fourth Amendment by using excessive force to place Mr. Falls under arrest. Complaint, ¶ 36. A municipality may not be held liable on a constitutional claim, regardless of what its policies authorize, if its employees did not commit a constitutional violation. *City of Los Angeles v. Heller*, 475 U.S. 796, 798-99 (1986). Here, the officers did not violate Plaintiff's decedent's constitutional rights because the amount of force used to effectuate the arrest was reasonable.

Initially, an officer may conduct an investigatory stop when there is a reasonable, articulable suspicion that criminal activity is afoot. *Illinois v. Wardlow,* 528 U.S. 119, 123 (2000) (citing *Terry v. Ohio*, 392 U.S. 1 (1968). Reasonable suspicion is a "less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence." *Id.* at 123. In *Wardlow*, the Supreme Court held that a person's unprovoked flight upon noticing the police is a relevant factor in determining reasonable suspicion. *Id.* at 124-125. The Court further observed that "[h]eadlong

flight—wherever it occurs—is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such." *Id.* The Court held that after the defendant's unprovoked flight from police, the officers were justified in suspecting that the Defendant was involved in criminal activity and investigating further. *Id.*

Here, Falls was wearing a disguise (itself a possible crime, see 21 O.S. §§ 1301 and 1303), engaging in behavior that was so suspicious or concerning that the store employees felt the need to call 911, and he immediately fled when approached by police. Falls was also in possession of a handgun, (also a potential crime, see 21 O.S. §1283 and 21 O.S. § 1290.8(C)), which he dropped shortly after the police gave chase. Like in *Wardlow*, Falls' behavior and his unprovoked flight were sufficient to justify pursuit and further investigation by the officers.

The officers use of force during the arrest also complied with constitutional standards. The Fourth Amendment governs claims of excessive force. *Graham v. Connor*, 490 U.S. 386 (1989). In determining whether the amount of force used to take a suspect into custody was reasonable, the ultimate question "is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397 (citations omitted). This standard "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396.

*Graham's* "objective reasonableness" standard also governs the use of a taser. *See Hinton v. City of Elwood, Kansas,* 997 F.2d 744 (10th Cir. 1993); *Casey v. City of Federal Heights,* 509 F.3d 1278 (10th Cir. 2007); and *Cavanaugh v. Woods Cross City,* 625 F.3d 661 (10th Cir. 2010). In *Casey* and *Cavanaugh,* the 10th Circuit Court of Appeals held that the use of a taser on a non-resisting, non-fleeing misdemeanant who did not pose an immediate threat to anyone was unconstitutional. *Casey,* 509 F.3d at 1285; *Cavanaugh*, 625 F.3d at 665. However, in *Hinton*, the court held that the use of a taser was appropriate where the suspect was resisting arrest by kicking his feet, flailing his arms, and biting the officers. *Hinton*, 997 F.2d at 781.

The 10th Circuit has also recognized that it is "beyond dispute that the safety of law enforcement officers during the performance of their duties is a 'legitimate and weighty' concern." *Novitsky v. City of Aurora*, 491 F.3d 1244, 1254 (10th Cir. 2007) (citing *Pennsylvania v. Mimms*, 434 U.S. 106, 110 (1977)). Additionally, officers "may use force during a Terry-type detention to the extent that 'such steps [are] reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop." *Id.* (citing *U.S. v. Hensley*, 469 U.S. 221, 235 (1985)). Those steps may include, (if necessary to protect their safety), drawing their weapon, placing a suspect in handcuffs, or forcing a suspect to the ground. *Id.*

Based on the facts known to the officers at the time, arresting Falls and the use of a taser were objectively reasonable. When the officers approached Falls in the Dollar General store in response to a 911 call regarding his disguise and suspicious behavior, he fled. During the ensuing foot chase he dropped a handgun. Officer Wake, who was

chasing Falls on foot, broadcast the pursuit and the fact that Falls had dropped a gun over this police radio. When Falls finally stopped running, he resisted the officers' attempts to place him in handcuffs and refused their instructions to give up his hands. Requiring Mr. Falls to get on the ground and give up his hands in order to be handcuffed was necessary for officer safety given that he had fled from the police and had dropped a handgun during the foot chase. Officers also observed that Falls was "digging" with his hands near his waistband. It was later discovered that Falls had a stun gun in his front pocket. Unlike the facts present in *Casey* and *Cavanaugh*, Falls was resisting arrest, attempting to flee, and posed a threat to those around him. The officers were aware that Falls had dropped a handgun and observed that he was actively resisting arrest while attempting to reach for his waist area. The taser was deployed only after Mr. Falls refused to comply with the officers' repeated instructions to give up his hands and continued to actively resist arrest. The suspect was an immediate threat to the officers and others as it was possible that he had other weapons on him. Under the totality of circumstances confronting the officers, deploying a taser to achieve Mr. Falls' compliance was objectively reasonable under the Fourth Amendment. The facts in this case are closer to those in *Hinton*, where the 10th Circuit Court of Appeals upheld the use of a taser on a suspect who was kicking and flailing his arms at the officers.

As none of the defendant officers deprived Plaintiff's decedent of any constitutional rights, Defendant City cannot be held liable regardless of what its policies authorize.

**Proposition II: Defendant City's Policies, Procedures, and Customs are Constitutional.**

In a § 1983 action, a municipality may only be held liable "for its own unconstitutional or illegal policies" and not merely because its employee injured the plaintiff. *Barney v. Pulsipher,* 143 F.3d 1299, 1308 (10th Cir. 1998). A municipal policy or custom must be the "moving force" behind a constitutional injury in order to impose municipal liability. *Monell v. Dep't. of Social Services*, 436 U.S. 658, 690-95 (1978). The challenged policy must also be "closely related to the violation of the plaintiff's federally protected right." *Schneider v. City of Grand Junction Police Department*, 717 F.3d 760, 770 (10th Cir. 2013). Proof of a single incident of unconstitutional activity is not sufficient to impose liability on a municipality where the policy relied on is not itself unconstitutional. *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823-24 (1985). Here, Plaintiff suffered no constitutional violation on July 5, 2010 and, in any event, Defendant City's policies regarding the use of force are constitutional.

Defendant City's policies regarding use of force are constitutionally sufficient and could not have been the direct cause of any alleged constitutional violation. The relevant policies, procedures, and rules are attached as Exhibits 35-62. None of these documents show any unconstitutional policy that could have led to a deprivation of Mr. Fall's constitutional rights. Defendant City's policy regarding use of force states that officers may only use the amount of force that is "objectively reasonable" in light of the facts and circumstances as a reasonable officer would perceive them to be at the time of the incident and that force may only be used to conduct an arrest, prevent escape, apprehend

an escapee, and to protect officers from danger. Thus, Defendant's City's written policies do not authorize an excessive or unlawful "beating" or "tasering" of a compliant suspect.

Plaintiff also alleges that the City had a "de facto" policy or custom of condoning the use of excessive force "which directly led to the attack on decedent." Plaintiff's Complaint, ¶ 32. However, Plaintiff has absolutely no proof that the City has a custom of condoning excessive force. The OCPD has an extensive investigation and review processes regarding the use of force and complaints lodged against police department employees. A supervisor investigates each use of force and the use of force is reviewed by a screening committee. (OCPD Procedures; 150.0 *et seq.*, Exhibit 50; 160.40, Exhibit 54.) In death cases, the District Attorney and the OCPD's Professional Standard Division each conduct their own review of the use of force. (Exhibit 50.) The OCPD also investigates and reviews each citizen complaint that is filed against an employee. (OCPD Procedure 143.0, Employees, Exhibit 53). The OCPD has an early intervention program to identify any officers that have a pattern of behavior regarding uses of force that warrants intervention. (OCPD Procedure No. 148.0, Exhibit 52.) Finally, Defendant City has policies and procedures regarding discipline of officers. (OCPD Policy No. 287.0, Exhibit 41; Procedure 170.0, Exhibit 55; Rule 205.0, Exhibit 60.) This investigation and review process negates any claim that the City was deliberately indifferent or that it had a custom of condoning the use of excessive force.

Moreover, even if Plaintiff could proof that such a custom existed, Plaintiff has no proof that the officers involved in this incident were aware of any such custom or that the custom directly caused the use of force in this case. In *City of St. Louis v. Praprotnik*, 485

U.S. 112(1988), the Supreme Court stated:

> Municipal liability may be based on a formal regulation or policy statement, or it may be based on an informal "custom" so long as this custom amounts to "a widespread practice that, although not authorized by written law or express municipal policy, is 'so permanent and well settled as to constitute a 'custom or usage' with the force of law.'"

*Id.* at 117. Plaintiff cannot meet the high standard described in *Praprotnik* because she has no proof that the OCPD has any "custom" other than what its written policies describe.

Defendant City is entitled to summary judgment because its policies and procedures are constitutional.

### Proposition III: Defendant City's Training of its Police Officers is Constitutional.

Plaintiff alleges that Defendant City failed to properly train its officers regarding use of force and that this alleged training deficiency somehow caused constitutional violations to be committed against her decedent. Notably, a "municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, __ U.S. __, 131 S. Ct. 1350, 1359 (2011). Indeed, a municipality's decisions regarding training will rise to the level of an official government policy for purposes of § 1983 only in limited circumstances. *Id.*

In *Canton v. Harris*, 489 U.S. 378, 388 (1989), the Supreme Court held that "the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to a deliberate indifference to the constitutional rights of persons with whom the police come into contact." The Court further stated:

In resolving the issue of a city's liability, the focus must be on the adequacy of the training program in relating to the tasks the particular officers must perform. That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program. See *Springfield v. Kibbe,* 480 U.S. at 268 (O'Connor, J., dissenting); *Oklahoma City v. Tuttle, supra,* at 821 (opinion of Rehnquist, J.). It may be, for example, that an otherwise sound program has occasionally been negligently administered. Neither will it suffice to prove than an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct. Such a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program to enable offices to respond properly to the usual and recurring situations with which they must deal. And plainly, adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable.

*Id.* at 390-91.

When a plaintiff alleges a constitutional violation due to a failure to train, he must prove that the training was, in fact, inadequate as well as satisfy the following requirements:

 (1) the officers exceeded constitutional limitations on the use of force; (2) the use of force arose under circumstances that constitute a usual and recurring situations [sic] with which police officers must deal; (3) the inadequate training demonstrates a deliberate indifference on the party [sic] of the City toward persons with whom the police officers come into contact, and (4) there is a direct causal link between the constitutional deprivation and the inadequate training.

*Carr v. Castle*, 337 F.3d 1221, 1228 (10th Cir. 2003). Regarding the requirement that the plaintiff prove deliberate indifference on the part of the City, the Court stated:

The deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm.

*Id.* at 1229 (quoting *Barney v. Pulsipher,* 143 F.3d 1299, 1307-08 (10th Cir. 1998).

Deliberate indifference is "a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick v. Thompson*, __ U.S. __, 131 S. Ct. 1350, 1359-60 (2011) (quoting *Board of Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 410 (1997). Additionally, a municipality must have "notice that a course of training is deficient in a particular respect," which usually requires proof that there was a "pattern of similar constitutional violations by untrained employees." *Id.* at 1360. Finally, the Supreme Court has rejected *respondeat superior* as a basis of liability for a municipality in a § 1983 civil rights case. *Id.*

The City trains its officers on the constitutional limits of the use of force. During a recruit's training on use of force, the recruit is instructed that she may use only the minimal amount of force necessary to accomplish the arrest. A recruit also instructed that no amount of physical force will be used on a suspect after they have been taken into custody. (Exhibits 8,9,11,13,14, 16, and 74-75.) Recruits are also provided instruction on when they may lawfully arrest a subject (Exhibits 7, 8, 10, 12, 13 and 15), and that a person who is injured while being taken into custody is to be provided medical care. (Exhibits 22, 74 and 76.)

Additionally, any OCPD officer that carries a taser is required to attend a 10 hour course on when and how to operate a taser. (Taser Training Manual, Exhibit 22.)   OCPD Policy 554.0 is the OCPD policy regarding an officer's use of force and it applies to the use of a taser.   (See 554.10 Definitions for Less Lethal Force/Device and 554.30(C) "Less Lethal Devices".  Exhibit 48.)  This policy allows officers to use the less lethal

device "to control dangerous and violent subjects when other tactics have been or will likely be ineffective." This policy authorizes an officer to use only the amount of force that is reasonably necessary to "A) Affect a lawful arrest… B) Protect themselves or others from danger of death or bodily harm." (Exhibit 48.)

There is a specific procedure, entitled "Less Lethal Devices," which applies to taser use. (Exhibit 51.) This procedure authorizes an officer to use a taser "to control a dangerous or violent subject where other tactics have been or will likely be ineffective in the situation." The policy also states, in part:

> 1. USAGE CRITERIA – (ERD) - The ERD is considered a use of force and shall be deployed in a manner consistent with the Department's use of force policy and training guidelines.

And

> The ERD may be used when:
>
> > a. Lesser force options are/or likely to be ineffective, and
> >
> > b. The officer reasonably believes the suspect poses a credible threat, and
> >
> > c. The subject poses a threat from a distance and the officer is at risk of injury if he/she attempts to close the gap.

Based on this training, Plaintiff is unable to prove that Defendant City's training is inadequate, that it was deliberately indifferent to a known or obvious risk regarding its training, or that any alleged deficiency in the training was a direct cause of any alleged constitutional violation concerning Plaintiff's decedent. Moreover, the OCPD investigates each incident involving a use of force and completes a review process to

determine if the use of force complies with OCPD policy.[11] (See Exhibit 50).  This investigation and review process negates any allegation of "deliberate indifference" in regards to the City's training on the use of force.

Accordingly, Defendant City is entitled to Summary Judgment on Plaintiff's "failure to train" claim.

### Proposition IV: Defendant City is Entitled to Summary Judgment on Plaintiff's Failure to Hire and Supervise Claim.

Plaintiff alleges that Defendant City failed to properly hire and supervise its police officers and that these alleged failures somehow caused Plaintiff's decedent's constitutional rights to be violated. Complaint, ¶ 32. In *Board of Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397 (1997), the Supreme Court considered the issue of municipal liability for an officer's alleged use of excessive force based on a claim of "wrongful hiring" and articulated the dangers inherent in imposing liability based on a single hiring decision:

> Where a claim of municipal liability rests on a single decision, not itself representing a violation of federal law and not directing such a violation, the danger that a municipality will be held liable without fault is high. Because the decision necessarily governs a single case, there can be no notice to the municipal decisionmaker, based on previous violations of federally protected rights, that his approach is inadequate.

*Id.* at 408. The Court went on to state:

---

[11] Such measures are not constitutionally required. See *Wilson v. Meeks,* 52 F.3d 1547, 1557 (10th Cir. 1995), remanded on other grounds and affirmed, 98 F.3d 1247 (10th Cir. 1996).

Cases involving constitutional injuries allegedly traceable to an ill-considered hiring decision pose the greatest risk that a municipality will be held liable for an injury that it did not cause. In the broadest sense, every injury is traceable to a hiring decision. Where a court fails to adhere to rigorous requirements of culpability and causation, municipal liability collapses into *respondeat superior* liability. As we recognized in *Monell* and have repeatedly reaffirmed, Congress did not intend municipalities to be held liable unless *deliberate* action attributable to the municipality directly caused a deprivation of federal rights. A failure to apply stringent culpability and causation requirements raises serious federalism concerns, in that it risks constitutionalizing particular hiring requirements that States have themselves elected not to impose.

*Id.* at 415. Thus, § 1983 claims based on a wrongful hiring decision must comply with stringent standards of causation and require proof that the municipality took some deliberate action that directly caused a constitutional violation.

The City is not aware of any Supreme Court case adopting a § 1983 "failure to supervise" claim against a municipality. However, the Supreme Court's statements regarding the proof required in a "wrongful hiring" claim would be equally applicable to a "wrongful supervision" claim in that it would require proof that the City committed some deliberate act that directly caused a constitutional violation. Additionally, if a "wrongful supervision" claim were to be adopted, it would require proof of deliberate indifference. *Bryson v. City of Oklahoma City*, 627 F.3d 784, 789-90 (10th Cir. 2010), *cert denied* ____ U.S. ____, 131 S.Ct. 3030 (2011) (holding that the City could not be liable for its failure to train or supervise one of its forensic chemists unless the municipal policymakers "can reasonably be said to have been deliberately indifferent to the need" for further training or supervision, citing *City of Canton*, 489 U.S. at 390.)

Plaintiff is without any evidence proving that Defendant City wrongfully hired or

supervised its police officers or that this alleged fault directly contributed to the violation of Plaintiff's decedent's constitutional rights. The City has policies and procedures in place to ensure that OCPD officers are qualified for the position. (OCPD Policy 665.0, Personnel, Exhibit 49; OCPD Procedure 424.0, Recruiting and Employment of Sworn Personnel, Exhibit 58). The City also has policies and procedures to ensure that all officers are appropriately supervised. (OCPD Policy 528.0, Field Supervision, Exhibit 47; OCPD Procedure 160.0, Departmental Boards and Committees, Exhibit 54). (Exhibit 1). Further, there is nothing to suggest that Defendant City took any deliberate action regarding the hiring or supervision of its police officers that caused a deprivation of Plaintiff's decedent's constitutional rights. Accordingly, Defendant City is entitled to summary judgment on Plaintiff's failure to properly hire or supervise claim.

## CONCLUSION

WHEREFORE, Defendant City respectfully requests that the Court grants its Motion for Summary Judgment as there is no genuine dispute of any material fact and the City is entitled to judgment as a matter law.

Respectfully submitted,

KENNETH JORDAN
Municipal Counselor

By:   /s/ Jennifer M. Warren
     Richard C. Smith, OBA #8397
     Jennifer M. Warren, OBA #30284
     Assistant Municipal Counselors
     200 N. Walker, Suite 400
     Oklahoma City, OK 73102
     (405) 297-2451 Fax: (405) 297-3851
     Attorneys for Defendant City
     rick.smith@okc.gov
     jennifer.warren@okc.gov

## CERTIFICATE OF SERVICE

I hereby certify that on the 23rd day of October, 2013, I electronically transmitted the attached Defendant City of Oklahoma City's Motion for Summary Judgment and Brief in Support to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants: James E. Devinney and Christopher W. Landes, Devinney Law Firm, PC, 115 East Grand, Ponca City, OK 74601, and Micky Walsh and Derek S. Franseen, 4508 North Classen Blvd., Oklahoma City, OK 73118, Attorneys for Plaintiff; and Susan Knight and Stacey Haws Felkner, One Leadership Square, Suite 800, 211 North Robinson Avenue, Oklahoma City, OK 73102, Attorney for Defendants Cole, Miller, Castro, and Wake.

/s/ Jennifer M. Warren
Assistant Municipal Counselor